UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

HOSPITAL AUTHORITY OF TIFT                CIVIL ACTION NO. 23-1170
COUNTY GEORGIA

VERSUS                                    JUDGE EDWARDS

DEMARIUS MCRAE                            MAG. JUDGE HORNSBY

## MEMORANDUM RULING & ORDER

Before the Court is a Motion for Summary Judgment[1] filed by Plaintiff Hospital Authority of Tift County, Georgia d/b/a Tift Regional Medical Center ("Plaintiff" or "Tift"). Defendant Demarius McRae ("McRae") opposes the motion.[2]

After careful consideration of the Motion, the record, and the applicable law, the Motion is **GRANTED**, and Plaintiff is granted summary judgment as a matter of law.

### I.    BACKGROUND

This is a breach of contract case in which the plaintiff, Tift, alleges non-payment of a debt, as evidenced by a promissory note ("the Note"), executed by McRae in favor of Tift.[3] Plaintiff alleges that the Note requires repayment of a sum paid by Tift to McRae pursuant to a "Continuing Education Loan Agreement" (the "Agreement") entered into between the parties in March of 2018.[4] Plaintiff alleges

---

[1] R. Doc. 21.
[2] R. Doc. 23.
[3] R. Doc. 1; R. Doc. 21-4 at 7-8.
[4] R. Doc. 21-4 at 4-6.

that McRae breached the Agreement and defaulted on the Note; therefore, Tift is seeking repayment of the outstanding debt plus interest and attorney fees.[5]

Tift, a hospital, hired McRae in March 2014 as Director of Cardiovascular Services.[6] During the course of McRae's employment, Tift offered tuition reimbursement whereby the hospital would loan money to its employees to cover expenses incurred by them through enrollment in hospital-approved education programs.[7] Employees could have the debt forgiven by working for Tift a certain amount of time after earning the degree.[8] In 2018, McRae enrolled at the University of North Carolina to pursue a Master of Business Administration ("MBA"). He participated in Tift's tuition reimbursement program[9] and signed the Agreement through which Tift loaned McRae $100,000 for education expenses.[10] The loan was to be repaid unless forgiven per specified terms.[11] McRae also signed the Note mirroring these terms.[12]

To qualify for forgiveness of the entire loan under the Agreement, McRae was required to remain employed with Tift for 36 months post-graduation.[13] Each year of continued employment would forgive one-third of the loan.[14] McRae graduated in July 2019 but resigned from Tift in July 2020, fulfilling only one year of the required

---

[5] R. Docs. 1 and 21.
[6] R. Doc. 21-2 at 21.
[7] R. Doc. 21-4 at 4.
[8] R. Doc. 21-4 at 5.
[9] R. Doc. 21-2 at 15; R. Doc. 21-4 at 1.
[10] R. Doc. 21-4.
[11] R. Doc. 21-4 at 4-8.
[12] R. Doc. 21-2 at 16; R. Doc. 21-4 at 7.
[13] R. Doc. 21-4 at 5: R. Doc. 21-4 at 7.
[14] *Id.*

commitment.[15] Consequently, Tift forgave $33,333.32 and demanded repayment of the remaining $66,666.68 plus interest.[16]

Per the terms of the Note and Agreement, once McRae was no longer employed with Tift, the entire unpaid and unforgiven balance borrowed by McRae became immediately due and payable to Tift.[17] McRae has not paid any money to Tift since his resignation despite amicable demand.[18] Plaintiff Tift filed suit in this Court on August 29, 2023.[19]

Tift filed the instant Motion for Summary Judgment asserting McRae breached the Agreement and likewise defaulted on the Note.[20] McRae responded, arguing his resignation was influenced by unfulfilled promises from Tift's Chief Operating Officer regarding career advancement.[21] McRae asserts in his opposition that, in 2017, Tift's COO, Chris Dorman ("Dorman"), assured him that once Dorman became Chief Executive Officer, McRae would be promoted to COO.[22] McRae contends that Dorman further encouraged him to pursue an MBA at the University of North Carolina, stating that Tift would cover the tuition in exchange for a commitment to work at Tift for three years post-graduation.[23] Notably, the opposition states McRae agreed to obtain the MBA, but "only agreed to do it because Dorman

---

[15] R. Doc. 21-2 at 22.
[16] R. Doc. 21-4 at 2.
[17] R. Doc. 21-1 at 7 ("In the event this Agreement is terminated, McRae is no longer employed by [Tift], or McRae is no longer enrolled in the MBA Program approved by [Tift] (except for instances where [Tift] approves a leave of absence from the MBA Program), the entire unpaid or unforgiven balance of the Student Loan Amount shall be immediately due and payable to [Tift]").
[18] R. Doc. 21-4 at 2; R. Doc. 21-5 at 2.
[19] R. Doc. 1.
[20] R. Doc. 21.
[21] R. Doc. 23 at 3.
[22] R. Doc. 23 at 1.
[23] *Id.*

led him to believe he would hire him as the Tift COO upon the position becoming available."[24] Finally, the opposition states that once the COO position did become available, Dorman did not choose McRae for the position.[25] In McRae's deposition, cited by both parties, McRae testified that he did not have any writing or documentation to demonstrate that such promises were made by Dorman, and stated it was a "verbal agreement."[26] In response, Tift points to Dorman's deposition where Dorman testified he did not promise the COO position to McRae in exchange for McRae obtaining an MBA.[27]

## II.    LEGAL STANDARD

Summary judgment is appropriate when the evidence shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[28] "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[29] "A dispute is genuine if the summary judgment evidence is such that a reasonable jury could return a verdict for the [non-movant]."[30] In evaluating a motion for summary judgment, the court "may not make credibility determinations or weigh the evidence" and "must resolve all ambiguities and draw all permissible inferences in favor of the non-moving party."[31]

---

[24] R. Doc. 23 at 2.
[25] *Id.*
[26] R. Doc. 21-2 at 7.
[27] R. Doc. 21-3 at 2-3.
[28] Fed. R. Civ. P. 56(a).
[29] *Hyatt v. Thomas,* 843 F.3d 172, 177 (5th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).
[30] *Id.* (internal quotations omitted).
[31] *Total E&P USA Inc. v. Kerr-McGee Oil & Gas Corp.*, 719 F.3d 424, 434 (5th Cir. 2013) (internal citations omitted).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."[32] "The moving party may meet its burden to demonstrate the absence of a genuine issue of material fact by pointing out that the record contains no support for the non-moving party's claim."[33] Thereafter, if the non-movant is unable to identify anything in the record to support its claim, summary judgment is appropriate.[34]

## III.   ANALYSIS

The substantive law governing the Court's analysis is Georgia law as the Note and Agreement provide that it "shall be governed and construed in accordance with the laws of the State of Georgia."[35] Neither party disputes the application of Georgia law. Under Georgia law, "construction [of a contract] is a matter of law for the court."[36]

Contract construction under Georgia law proceeds in three steps. First, "the trial court must decide whether the language is clear and unambiguous. If it is, no construction is required, and the court simply enforces the contract according to its

---

[32] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting *Anderson*, 477 U.S. at 247).

[33] *Stahl v. Novartis Pharm. Corp.,* 283 F.3d 254, 263 (5th Cir. 2002).

[34] *Id.*

[35] R. Doc. 21-4 at 5 ("This Agreement shall be governed and construed in accordance with the laws of the State of Georgia"); R. Doc. 21-4 at 8 ("This Note shall be governed by, and construed according to the laws of the State of Georgia").

[36] *Envision Printing, LLC v. Evans*, 336 Ga. App. 635, 786 S.E.2d 250, 252 (2016); *see also Gans v. Ga. Fed. Sav. & Loan Ass'n*, 179 Ga. App. 660, 347 S.E.2d 615, 618 (1986) ("It is ordinarily the duty of the court to interpret a contract as a matter of law.").

clear terms."[37] To determine whether the language of a contract is clear and unambiguous "[t]he court [initially] looks to the four corners of the agreement to ascertain the meaning of the contract from the language employed."[38] In that analysis, "[w]ords generally [are ascribed] their usual and common signification."[39] Further, the Supreme Court of Georgia has held that in a conflict between a written agreement and a prior oral agreement, the terms of the written agreement govern:

> Where a conflict exists between oral and written representations, it has long been the law in Georgia that if the parties have reduced their agreement to writing, all oral representations made antecedent to execution of the written contract are merged into and extinguished by the contract and are not binding upon the parties. In written contracts containing a merger clause, prior or contemporaneous representations that contradict the written contract "cannot be used to vary the terms of a valid written agreement purporting to contain the entire agreement of the parties, nor would the violation of any such alleged oral agreement amount to actionable fraud. [40]

In the Court's view, there may be a genuine dispute over whether assurances of promotion to the COO position were made by Dorman to McRae; however, such a dispute is immaterial. The contract's terms are clear and unambiguous, and Georgia law is clear that prior oral agreements, once they are reduced to writing, are superseded by the written contract. Additionally, Georgia law is also clear that in written contracts containing a merger clause, which the Agreement at issue does, "prior or contemporaneous representations that contradict the written contract 'cannot be used to vary the terms of a valid written agreement purporting to contain

---

[37] *Envision Printing*, 786 S.E.2d at 252 (quoting *General Steel v. Delta Bldg. Sys.*, 297 Ga. App. 136, 676 S.E.2d 451, 453 (2009)).

[38] *Brogdon v. Pro Futures Bridge Cap. Fund, L.P.*, 260 Ga. App. 521, 580 S.E.2d 303, 306 (2003).

[39] O.C.G.A. § 13-2-2(2).

[40] *First Data POS, Inc. v. Willis*, 273 Ga. 792, 794–95, 546 S.E.2d 781, 784 (2001) (quoting *Campbell v. C & S Nat. Bank*, 202 Ga. App. 639, 415 S.E.2d 193 (1992)) (internal citations omitted).

the entire agreement of the parties, nor would the violation of any such alleged oral

agreement amount to actionable fraud.'"[41]

The Agreement's terms are clear and unambiguous:

3. <u>Loan Amount and Repayment</u>

    a) The Authority [Tift] agrees to loan McRae up to One Hundred Thousand Dollars ($100,000.00) (the "Student Loan Amount") for expenses incurred by McRae in obtaining his MBA. [Tift] may loan the Student Loan Amount in incremental amounts equal to the amounts owed by McRae for tuition and other expenses for the then-current school term.

    b) To the extent the Student Loan Amount is not repaid or forgiven in accordance with the provisions of Section 4 below, McRae agrees to repay [Tift] the Student Loan Amount, plus accrued interest, in three (3) equal and consecutive annual payments, the first payment being due twelve (12) months from the date of McRae's graduation from the MBA Program, as provided in the Student Loan Note payable to [Tift] and executed by McRae contemporaneously with this Agreement.

    c) In the event this Agreement is terminated, McRae is no longer employed by [Tift], or McRae is no longer enrolled in the MBA Program approved by [Tift] (except for instances where [Tift] approves a leave of absence from the MBA Program), the entire unpaid or unforgiven balance of the Student Loan Amount shall be immediately due and payable to [Tift].[42]

The terms for forgiveness in Section 4 are likewise clear and unambiguous:

4. <u>Forgiveness of Loan.</u> Repayment of the Student Loan Amount is subject to forgiveness in three (3) equal annual installments. In order for [Tift] to forgive any annual installment amount, McRae must remain employed by [Tift] pursuant to the terms of this Agreement and must have provided services required under McRae's employment agreement

---

[41] *First Data POS, Inc. v. Willis*, 273 Ga. 792, 546 S.E.2d 781 (2001) (quoting *Campbell*, 415 S.E.2d 193 (1992).

[42] R. Doc. 21-4 at 4; R. Doc. 21-4 at 7 (The Note mirrors the terms of the Agreement: "In three (3) equal and consecutive annual payments, the first payment being due twelve (12) months from the date of the undersigned's graduation from the MBA Program (as defined in the Agreement) approved by the hospital. However, said annual payments shall be forgiven if the undersigned complies with the terms and conditions of the Agreement. In the event the Agreement is terminated for any reason, the undersigned is no longer employed by the hospital, or the undersigned is no longer enrolled in the MBA Program approved by the hospital the entire unpaid or unforgiven balance shall become immediately due and payable").

with [Tift] for the preceding twelve (12) month period. The amount forgiven shall be reported as income to McRae in the year forgiven. In the event that this Agreement is terminated for any reason, McRae is no longer employed by [Tift], or McRae is no longer enrolled in the MBA Program approved by [Tift] (except for instances where [Tift] approves a leave of absence from the MBA Program) all amounts outstanding (principal plus accrued interest) and not previously forgiven, shall become immediately due and payable.[43]

The Agreement stipulates that one-third of the loan balance would be forgiven annually, provided McRae remained employed for 12 consecutive months during each year of the three-year period. McRae's one year of service qualified him for forgiveness of the first installment. However, his resignation rendered the remaining two-thirds "immediately due and payable."[44]

Finally, the merger clause ("Merger clause") in Section 7(a) of the Agreement is clear and unambiguous:

7. <u>Miscellaneous.</u>

a) This Agreement constitutes the entire agreement of the parties as to the subject matter hereof and supersedes all prior discussions, negotiations, and agreements between the parties as to such subject matter.[45]

The Agreement explicitly states that it "constitutes the entire agreement of the parties as to the subject matter hereof and supersedes all prior discussions, negotiations, and agreements between the parties as to such subject matter."[46] McRae's reliance on any alleged verbal assurances by Dorman is barred by the merger

---

[43] R. Doc. 21-4 at 5.
[44] *Id.*
[45] *Id.*
[46] *Id.*

clause. Georgia law is unequivocal in enforcing such clauses, precluding any attempt to contradict the written terms with prior oral agreements.

By way of argument in his opposition, McRae provides the definition of a contract under Louisiana law, and a recitation of the four elements required for contract formation.[47] Then McRae cites a failure of cause—one of the elements necessary for contract formation—because "Dorman's hiring of someone with less experience and directly breaching his promise to Mr. McRae is a breach of the contract and precludes summary judgment."[48]

First, Georgia law, not Louisiana law, governs contract formation over the Note and Agreement. Second, Georgia law and the inclusion of the Merger clause extinguished and superseded any prior conversation or agreement Dorman and McRae may have had in regard to the Agreement. The undisputed facts confirm that McRae signed the Note and Agreement, incurred a $100,000 debt, and fulfilled the requirements for forgiveness of only one-third of the loan. Upon resigning, the remaining balance became immediately due. Accordingly, McRae is obligated to repay the unforgiven balance under the Note and Agreement's clear terms.

## IV.    CONCLUSION

McRae has failed to create a genuine dispute of material fact. The uncontroverted evidence in the record establishes that McRae incurred a debt and did not satisfy the conditions necessary for forgiveness of the full debt. He now owes the remaining balance plus interest and attorney fees which is due and unpaid.

---

[47] R. Doc. 23 at 3.
[48] *Id.*

Without offering evidence to demonstrate anything to the contrary, summary judgment in favor of Plaintiff Tift is appropriate.

**IT IS ORDERED** that Tift's Motion for Summary Judgment (R. Doc. 21) is **GRANTED**.

**IT IS FURTHER ORDERED** that within 14 days of this ruling's issuance, Plaintiff shall submit a proposed judgment consistent with this ruling and provide an affidavit to support the calculation of the amount to be included in the judgment.

**THUS DONE AND SIGNED** this 28th day of January, 2025.

_____
**JERRY EDWARDS, JR.**
**UNITED STATES DISTRICT JUDGE**